# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| MELISSA A. SEARS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Acting Commissioner of Social Security ) <br> ) <br> Defendant. ) | Case No. 2:14-cv-70-JAR |

## **MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying Melissa A. Sears' ("Sears") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq., and supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381-85.

### I.  Background

On June 28, 2011, Sears filed an application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and on July 1, 2011 filed an application for Supplemental Security Income Benefits ("SSI") under Title XVI, §§ 1381-1385. (Tr. 190-198, 199-207.) The Social Security Administration initially denied Sears' claim for disability insurance benefits and SSI on July 26, 2011. (Tr. 138-142.) Following the initial denial, Sears filed a timely Request for Hearing by Administrative Law Judge ("ALJ") on August 16, 2011 (Tr. 145), and a hearing before the ALJ was held on November 8, 2012. (Tr. 39.) The ALJ issued a written decision on November 21, 2012, upholding the denial of benefits. (Tr. 8-24.) Sears

1

requested review of the decision by the Appeals Council (Tr. 38); on May 14, 2014, the Appeals Council denied her request for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Sears filed this Complaint on June 30, 2014. (Doc. No. 1.) The Commissioner filed an Answer on August 29, 2014. (Doc. No. 9.) On January 5, 2015, Sears filed a Brief in Support of Complaint. (Doc. No. 19.) The Commissioner filed a Brief in Support of the Answer on March 27, 2015. (Doc. No. 24.) Sears did not file a reply brief.

## II. Decision of the ALJ

In a decision dated November 21, 2012, the ALJ concluded that Sears had not been under a disability within the meaning of the Social Security Act from December 19, 2009, through November 21, 2012. (Tr. 8, 12, 24.) The ALJ determined that Sears met the insured status requirements of the Social Security Act through December 31, 2012, and had not engaged in substantial gainful activity since December 19, 2009, the alleged onset date. (Tr. 13.) Additionally, the ALJ concluded that Sears had severe impairments of diabetes mellitus type I, asthma, tendonitis of the right wrist with history of release surgery, and cognitive disorder. (Tr. 13-14.) However, the ALJ finally determined that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

Instead, the ALJ concluded that Sears has the residual functional capacity ("RFC") to perform light work, except she should avoid concentrated exposure to extreme temperatures, extreme humidity, and irritants, such as gas, fumes, and chemicals due to her asthma and diabetes. (Tr. 22).) Also, Sears is limited to unskilled work, a low-stress environment, simple decision making, only minor infrequent changes, and no contact with the public due to her

cognitive disorder and complications from her diabetes. Id. While the ALJ found that Sears is unable to perform any past relevant work, the ALJ did determine that there are jobs that exist in significant numbers in the national economy that she can perform, including collator operator, order caller, and routing clerk. (Tr. 22-24.) Following this determination, the ALJ concluded that Sears had not been under a disability, as defined in the Social Security Act, from December 19, 2009, through November 21, 2012. Id.

### III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

#### A. Hearing Testimony

The ALJ held a hearing in this matter on November 8, 2012, wherein the ALJ heard testimony from Sears and Ms. Denise Weaver, a vocational expert. (Tr. 39-40.)

#### 1. Sears' Testimony

At the time of the hearing, Sears was living with her husband and three-year old daughter. (Tr. 52.) During the day, she provides care for her daughter with the help of her sister-in-law. (Tr. 52-53.) Sears has a driver's license but has not driven regularly since February, 2011, when she suffered a stroke. (Tr. 53-54.) Sears' husband does most of the housework, including dishes, cooking, and taking out the trash but she is able to load and unload the dishwasher. (Tr. 77-78.) Her mother also helps with the housework and with watching Sears' daughter. (Tr. 80.) Sears testified that she was able to go on a cruise with her family, but was not able to participate in all the activities including scuba diving. (Tr. 61.)

Sears last worked in 2007 and has looked for work since 2007, but claims that she has been unable to find a job. (Tr. 55-56.) She previously worked as an order processor and a cashier but had to stop due to swelling and pain in her right wrist that developed following wrist surgery

in 2006. (Tr. 56.) Sears stated that, following the wrist surgery, she was unable to complete the job functions that required repetitive motion with her wrist and lifting weighted objects. (Tr. 56-57.) Sears testified that she also has problems with lifting objects at home, including her daughter who weighs 30 pounds. (Tr. 58.)

In addition to her wrist, Sears has problems with walking and standing when her blood sugar levels are low. (Tr. 59.) She is able to walk sixteen blocks, with rest stops, before her asthma sets in and she gets short of breath or her blood sugar starts to drop. Id. In February of 2011, Sears also began noticing some problems with her mental functioning. (Tr. 62.) She explained that she has had trouble with grasping concepts and concentrating in conversations. Id. To help with her mental functioning, Sears has been evaluated by and worked with Dr. Brick Johnstone in Columbia, Missouri. (Tr. 63-64.)

Sears also regularly meets with Dr. Rick Bonnette, her family doctor. (Tr. 65.) She will visit Dr. Bonnette for regular healthcare and when she is having trouble with her breathing, and regular healthcare, but will go to the Endocrinology Center when she has trouble with her diabetes. Id. Although Dr. Bonnette has opined that Sears could work at a sedentary job, Sears disagrees with Dr. Bonnette's opinion because Sears believes that she would have trouble working at a job where she would have to comprehend instructions, type out orders, and be restricted to when she can leave to go to the restroom if her blood sugar is high. (Tr. 66.)

With regard to her blood sugar levels, Sears tests her blood sugar at least ten times a day. (Tr. 68.) She had also been placed on an insulin pump to help regulate her blood sugar levels. Id. Even after being placed on the insulin pump, Sears testified that she still has trouble regulating her blood sugar levels due to her poor memory and inability to constantly see a doctor. Id. Her symptoms from high and low blood sugar are similar, in that she feels very tired, but Sears

explained that she is able to differentiate the experiences because she gets very thirsty when her blood sugar is high. (Tr. 69.) If her blood sugar is high, Sears takes her Insulin and then will recheck to make sure that it has dropped. Id. If it is low, she will shut the Insulin pump off and eat to bring it back up. (Tr. 69-70.) Sears testified that there have been instances where she has had seizures, numb hands, and inability to walk due to her low blood sugar. (Tr. 70-71.) Usually, within an hour she is able to get her blood sugar back up to normal levels. (Tr. 70).

Sears also explained that she saw Dr. Kim Jamison to help treat her changing blood sugar levels. (Tr. 72.) Sears cannot think of a time where her blood sugar level has remained at an appropriate level for 24 hours. (Tr. 73.) When her blood sugar is high, Sears feels tired, worn out, spacey, and thirsty. (Tr. 74.) To bring it down, she takes Insulin and tries to move around to burn off more calories faster. Id. It takes between an hour to two hours for the Insulin to fully be in effect and for her blood sugar to go down to regular levels. (Tr. 75.) Sears explained that she considers a low blood sugar reading to be below 80. Id. When her blood sugar is low, Sears gets shaky, clammy, numb hands, and sometimes experiences seizures. Id. If her blood sugar is below 50, Sears will shut the Insulin pump off until it returns to 120. Id. It is not unusual for her blood sugar to be below 80 twice a day. (Tr. 76.) After turning her Insulin pump off and eating something, it takes fifteen to twenty minutes for her symptoms to stop. Id.

### 2. Vocational Expert's Testimony

Ms. Denise Weaver ("Weaver") testified at the hearing as a vocational expert. (Tr. 87.) Weaver detailed Sears' past work experience including: kitchen helper, Dictionary of Occupational Titles ("DOT") code 318.687-010, with a specific vocational preparation ("SVP") level of 2, medium work; assembler, DOT code 754.687-010, SVP of 4, medium work; laborer stores, DOT code 922,687-058, SVP of 2, medium work; and order clerk, DOT code 249.362-

5

026, SVP of 4, sedentary work. Id. Sears also has experience as a cafeteria cashier, DOT code 211.462-010, SVP of 2, light work, and nursery school attendant, DOT code 359.677-018, SVP of 4, light work. (Tr. 88.)

The ALJ then asked Weaver to assume a hypothetical individual of the same age, education, and work history as Sears, and further assume that the individual is limited to occasionally lifting up to twenty pounds and frequently lifting or carrying ten pounds, standing/walking six hours out of an eight hour workday and sitting six hours out of an eight hour workday. Id. Further, the individual is to avoid concentrated exposure to temperature or humidity extremes, irritants such as gas, fumes and chemicals, and is able to understand, remember and carry out simple instructions with unskilled work, and could only perform simple decision making related to basic work functions, have no contact with the general public, and could be expected to be distracted from job duties or otherwise off task five percent of the workday or shift. (Tr. 88-89.)

Weaver testified that such a hypothetical individual could not perform any of the past jobs described, but that there were other positions available meeting the criteria. (Tr. 89.) These positions included coalator/operator, DOT code 208.685-010, SVP of 2, light strength, with an estimated 2,960 jobs in Missouri and 261,990 jobs nationally; order caller, DOT code 209.667-014, SVP of 2, light strength, with an estimated 65,280 jobs in Missouri and 2,828,140 jobs nationally; and routing clerk, DOT code 222.687-022, SVP of 2, light work, with an estimated 12,670 jobs in Missouri and 687,940 jobs nationally. (Tr. 89 – 90.) Weaver further testified that these jobs would include the possibility for a person to be distracted from job duties or otherwise off task for five to ten percent of the workday or shift. (Tr. 91.)

In a second hypothetical, the ALJ asked Weaver to assume the same hypothetical but with the following change: the individual would be limited to sedentary work (that is, occasional lifting of only ten pounds and frequent lifting of less than ten), and standing/walking for only two hours out of an eight hour day). (Tr. 92.) While none of the previously stated jobs would be feasible for this second hypothetical individual, Weaver testified that the position of tube operator, DOT code 239.687-014, a sedentary position with an SVP of 2 would be available. Id. Weaver testified that 180,010 such jobs exist in the national economy, and 83,250 such jobs exist in Missouri. Id. Weaver noted that two additional positions—polisher implant and dowel inspection—that, among others, would also meet the criteria. (Tr. 93.)

Further altering the hypotheticals, the ALJ asked Weaver whether the available jobs mentioned would be affected by a limitation to occasional handling and fingering with the upper dominant extremity. (Tr. 94.) Weaver responded that such a limitation would eliminate all the positions mentioned. Id. Weaver further testified that two positions in the light work range would remain available: ironer, DOT code 590.685-042, SVP of 2, with 235,910 jobs in the national economy and 7,660 jobs in the Missouri economy; and groover and stripper operator, DOT code 669.685-102, SVP of 2, with 58,730 such jobs in the national economy and 720 such jobs in Missouri. (Tr. 95-96.)

Upon cross-examination by Sears' counsel, the vocational expert further testified that, for any of the jobs mentioned, an individual likely could not pass a probationary period if she missed more than two days of work during that time. (Tr. 99.) Additionally, the jobs would not be available to an individual who was off task fifteen to twenty percent of the time. (Tr. 105.)

### B. Medical Records

The ALJ summarized Sears' medical records at Tr. 13-24. Relevant medical records are discussed as part of the analysis.

### IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation

process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the

claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F. Supp. 2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
> (2) The education, background, work history, and age of the claimant;
> (3) The medical evidence given by the claimant's treating physicians;
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
> (5) The corroboration by third parties of the claimant's physical impairment;
> (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

## V.     Discussion

Sears argues that the ALJ's unfavorable decision should be remanded because it does not cite medical sources supporting the assigned RFC (Doc. No. 19 at 14), and because the vocational expert did not properly consider Sears' mental impairment in her analysis of available work. (Doc. No. 19 at 17.) Upon review, the Court finds substantial evidence in the record to support the ALJ's decision.

**Medical Evidence**

Sears first argues that the RFC assigned by the ALJ is erroneous in that it does not cite supporting medical sources. (Doc. No. 19 at 14.) The Commissioner responds that the ALJ properly assessed Sears' RFC by relying on the record as a whole rather than any specific medical source. (Doc. No. 24 at 3.) Here, the Court finds the ALJ's determination of Sears' RFC is supported by substantial evidence.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (citing S.S.R. 96–8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996); 20 C.F.R. § 404.1545(a)). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." Roberson, 481 F.3d at 1023 (internal citations omitted). See also Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). An ALJ is not limited to considering medical evidence exclusively in determining RFC. Cox, 495 F.3d at 619 (citing Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be

proved *only* by medical evidence, we disagree.")). Finally, while the ALJ is required to fully develop the record, she is not required to discuss in detail each and every piece of evidence submitted—and a failure to mention a piece of evidence does not mean it was not considered. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

Here, the ALJ found that Sears had the RFC for light work with significant limitations. (Tr. 17.) The ALJ made multiple references to Sears' medical records in laying out her findings. (Tr. 18-20.) She wrote that "there is evidence of [Sears'] diabetes not being controlled in the record; however, the alleged severity is not supported by the medical evidence." (Tr. 18.) She elaborated on her findings with examples. For example, Sears testified that her blood sugar fluctuations were so severe as to limit her mobility and force her to take frequent stops and rests. (Tr. 55, 61.) But as the ALJ noted (Tr. 18), Sears' endocrinologists' treatment notes do not reflect such complaints, but instead mention "no swelling or joint pain," (Tr. 311) and "normal gait and station . . . stability and strength" (Tr. 312). Similarly, with regard to Sears' asthma, the ALJ wrote that "[Sears'] pattern of treatment for her asthma consisted of prescription medications with little or no regular treatment." (Tr. 19) The ALJ cited Dr. Bonnette's note that Sears "denies any flare up of her asthma." (Tr. 352.) Regarding Sears' difficulty with her wrist, the ALJ wrote that, although Sears did undergo surgery (citing the appropriate medical records, Tr. 550), "the record does not reflect any significant or ongoing treatment or complaints regarding [Sears'] wrist during the alleged period of disability." (Tr. 19.) In short, the ALJ considered the medical evidence in light of Sears' own testimony and with a view toward the actual limitation indicated. An ALJ will often be limited to this type of analysis, and is not required to produce evidence and affirmatively prove that a claimant is able to perform certain functions. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

The ALJ also considered Sears' subjective complaints, but correctly noted that subjective complaints are to be discounted if not supported by objective evidence. (Tr. 18.) An ALJ is entitled to evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217.) Here, the ALJ explained that she partially discounted Sears' subjective complaints regarding severity based on both the objective medical evidence and Sears' own written report that she can perform basic household chores, including load the dishwasher, sweep and mop floors, and do laundry. (Tr. 20, citing Tr. 257). The ALJ's evaluation of Sears' credibility is reasonable and supported by substantial evidence.

Finally, the ALJ addressed the opinions of Sears' doctors, Dr. Bonnette and Dr. Johnstone, but explained that she gave only partial weight to each. (Tr. 21-22.) An ALJ must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with the other substantial evidence in the record. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).

Dr. Bonnette opined that Sears could stand for two hours in an eight hour day (without specifying whether Sears might be capable of standing for a longer period of time). (Tr. 469.) However, he also acknowledged that Sears cares for her infant daughter. Id. The ALJ wrote that because of this seeming contradiction, and the fact that no objective evidence supports that Sears experiences difficulty with standing or walking, she would give Dr. Bonnette's opinion only partial weight. (Tr. 21.) The ALJ's interpretation of Dr. Bonnette's opinion as it correlates to Sears' RFC is reasonable and supported.

Dr. Johnstone performed a one-time psychological evaluation for Sears, and stated that "Ms. Sears appears to be an appropriate candidate for disability benefits." (Tr. 441.) But an ALJ is entitled to assign the opinions of a treating physician little weight where such opinions are conclusory opinions contradicted by other objective medical evidence. See Social Security Ruling 96–2p; Stormo v. Barnhart, 377 F.3d 801, 805–06 (8th Cir. 2004); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). There is no deference for a treating physician's opinion that a claimant is disabled or cannot be gainfully employed because it invades the province of the Commissioner on the ultimate disability determination. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007). Moreover, as the ALJ noted, the remainder of Dr. Johnstone's observations are not based on longitudinal study. (Tr. 22.) Again, the ALJ's decision to give only partial weight to Dr. Johnstone's opinion is reasonable and supported by substantial evidence.

After a thorough review of the evidence, including medical evidence, the ALJ determined that Sears has the RFC for a reduced range of light work. (Tr. 17.) Although the ALJ did not cite specific medical evidence to support the range of work for which she found Sears eligible, she performed her role adequately by integrating and analyzing the medical evidence presented in tandem with other factors, such as Sears' own credibility. See Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010) (credible medical source opinions are not strictly required where the ALJ considers medical records, the claimant's statements, and other evidence). This Court's standard on review is not whether substantial evidence exists in opposition to the ALJ's conclusion, but whether substantial evidence exists to support it. Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010) (internal citation omitted); Krogmeier, 294 F.3d at 1022. For the reasons stated, the Court concludes that substantial evidence exists to support the ALJ's finding and therefore affirms the ALJ's conclusion.

**Mental Impairment**

Sears next argues that the ALJ erred in evaluating Sears' mental impairment by failing to properly instruct the vocational expert pursuant to Muncy v. Apfel, 247 F.3d 728 (8th Cir. 2001). (Doc. No. 19 at 18.) The Commissioner responds that the vocational expert proffered testimony that fully accounted for Sears' limitations. (Doc. No. 24 at 8.) Again, the Court finds that the ALJ's determination is supported by substantial evidence.

When "a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner [must rely on] a vocational expert to support a determination of no disability." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999); see also Muncy, 247 F.3d at 734-735. "Nonexertional limitations 'affect an individual's ability to meet the nonstrength demands of jobs,' Social Security Ruling 96–4p, 1996 WL 37418, *1 (1996), 'that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling[.]'" Sykes v. Astrue, No. 4:06cv1732 TCM, 2008 WL 619216, at *19 (E.D. Mo. March 3, 2008) (quoting 20 C.F.R. § 404.1569a(a)).

Here, Sears argues that because Dr. Johnstone found Sears' IQ to be in the borderline range (Tr. 445), the vocational expert was required to be informed of this medical information when making her occupational determinations. (Doc. No. 19 at 18.) The ALJ's hypothetical invoked an individual who "is able to understand, remember and carry out simple instructions with unskilled work, and could only perform simple decision making related to basic work functions, have no contact with the general public, and could be expected to be distracted from job duties or otherwise off task five percent of the workday or shift." (Tr. 88-89.) But, the ALJ did not specify that the individual had a borderline IQ. Thus, Sears urges the Court to overturn

15

the ALJ's decision, which was necessarily predicated on the testimony of the vocational expert. (Doc. No. 19 at 18, Tr. 23-24).

Sears' argument both misconstrues the law and fails to account for the relevant facts. First, Dr. Johnstone did not actually diagnose Sears with borderline intellectual functioning, but with a cognitive disorder. (Tr. 441.) Moreover, Sears' IQ scores alone are not conclusive of her mental condition. See, e.g., Walker v. Astrue, No. 2:07-CV-53, 2009 WL 728573, at *11 (E.D. Mo. Mar. 17, 2009) (internal citations omitted) ("[T]he Commissioner need not rely exclusively on IQ scores and may disregard test scores that are inconsistent with the record.")

But even assuming that Sears' IQ scores do constitute borderline intellectual functioning, the ALJ needs only express the consequence of the impairment when presenting the nonexertional limitation to the vocational expert; she is not under an obligation to name the specific impairment itself. Gieseke v. Colvin, 770 F.3d 1186, 1189 (8th Cir. 2014) (citing Cox, 495 F.3d 614 at 620) ("[T]he ALJ may rely on testimony by a [vocational expert] that is 'based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'") Here, the limitations proffered by the ALJ included "simple instructions with unskilled work, simple decision making related to basic work functions, no contact with the general public, distracted from job duties or otherwise off task five percent of the workday or shift." (Tr. 88-89.) These limitations were an adequate summary of the likely effects of Sears' borderline IQ. In fact, the limitations appear to have been derived directly from Dr. Johnstone's opinion, which set out recommendations for Sears such as "[f]ocus on one task at a time" and "[m]inimize distractions in the environment." (Tr. 443.) Dr. Johnstone wrote that Sears "should be provided appropriate time to process, learn, and recall information" (Tr. 443), a

limitation parroted by the ALJ in her hypothetical individual's limitation to "simple instructions with unskilled work." (Tr. 88.)

The ALJ correctly evoked testimony from the vocational expert that accounted for Sears' cognitive impairment. Therefore, the ALJ's determination is properly supported by substantial evidence.

## VI. Conclusion

For these reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

Dated this 30th day of September, 2015.